## BOLT *v.* HACKLEY NATIONAL BANK.

1. TRUSTS—ACCOUNTING—CONTRACTS—EVIDENCE—SUFFICIENCY.

In a suit against an administrator for an accounting for profits received by deceased on the sale of lands held in trust by him to secure a debt owing by plaintiff, evidence *held*, sufficient to show an agreement that plaintiff was to share in said profits.

2. SAME—CONTRACTS—PERFORMANCE.

Defendant's claim that plaintiff did not fully perform his part of the contract by procuring purchasers for the lands, *held*, not established by the record, from which it appears that deceased was satisfied with plaintiff's efforts to sell.

3. SAME—ABANDONMENT—ESTOPPEL.

Defendant's claim that plaintiff abandoned or rescinded the contract whereby he was to share in the profits on sales of lands conveyed by him to deceased to secure a debt, *held*, not supported by evidence; plaintiff's consent to the conveyance of the lands to a third party, in the sale of which he was to benefit equally with deceased, being but a modification of the former contract; nor was he thereby equitably estopped from asserting his claim for an accounting.

4. EQUITY—LACHES.

Delay to assert a right does not in itself constitute laches.

5. TRUSTS—LACHES—ACCOUNTING—DELAY IN COMMENCING SUIT.

Delay in commencing suit to enforce an accounting under a trust relation, where there is no evidence of any denial of liability thereunder, *held*, not a bar thereto.

[*] Continued from Vol. 245.

Appeal from Muskegon; Vanderwerp (John), J. Submitted January 11, 1929. (Docket No. 83, Calendar No. 33,880.) Decided March 28, 1929.

Bill by Orin T. Bolt against the Hackley National Bank, administrator *de bonis non* with the will annexed of the estate of Stephen H. Clink, deceased, and others for an accounting. From a decree dismissing the bill, plaintiff appeals. Reversed, and decree entered for plaintiff.

*Cross, Foote & Sessions* (*A. E. Ewing*, of counsel), for plaintiff.

*Edward C. Farmer* and *Butterfield, Keeney & Amberg,* for defendants.

SHARPE, J. On December 29, 1906, the plaintiff and several other men associated with him in business under the name of the Muskegon Lumber Company were indebted to certain banks and others in the sum of about $10,000. To secure this indebtedness, they executed a quitclaim deed of a number of descriptions of real estate owned by them to the late Stephen H. Clink, of Muskegon, as trustee, for the purpose of enabling Clink to execute a mortgage thereon to John W. Wilson, trustee, to secure payment of such indebtedness. The mortgage was executed accordingly. There having been default in payment, foreclosure was had and decree rendered on January 18, 1909, adjudging $13,148.63 to be due thereon, and authorizing a sale to secure payment thereof. Sale was had on March 10, 1909, and the property sold to several bidders for the aggregate sum of $13,395.

On March 16, 1909, a written contract was entered into between plaintiff and Clink, which, after recit-

ing that Clink owned the lands subject to the incumbrances thereon and that plaintiff claimed to be able to sell them at prices—

"to be fixed and approved of by the said Clink and sufficient in amount and price to pay off all said liens and leave a balance in lands and money or securities,"

—and that plaintiff would use his best endeavors to do so, provided that all moneys so received by Clink in excess of that required to pay such indebtedness should be equally divided between plaintiff and Clink and that each of them should have an equal interest in any lands remaining unsold.

Plaintiff failed to sell any of said lands, and, when the period of redemption under the foreclosure sales was about to expire, a parol agreement (subsequently reduced to writing) was entered into between Clink and Otto G. Meeske, whereby Clink deeded the lands to Meeske and wherein Clink agreed "to take charge of the handling and selling of said lands, subject to the approval of said Meeske;" that Meeske should pay such indebtedness, and the net profits on such sales should be divided between them. The agreement provided, however, that Meeske should have the right to terminate it at the expiration of six months from its date on giving notice to Clink, and that an accounting should then be had, and, on failure of Clink to pay any balance due Meeske, the lands unsold should be his sole property.

It is plaintiff's claim that the arrangement and contract between Meeske and Clink were made by the latter as trustee for himself and plaintiff, and were to be subject to plaintiff's rights under his written agreement with Clink, made on March 16, 1909. The bill of complaint herein was filed by him on

May 17, 1926, to enforce such trust and to determine his rights thereunder and for an accounting and adjustment of their respective interests in the moneys received by Clink and the lands subsequently retained by him. In the meantime, Mr. Clink had passed away on April 13, 1925, and the defendant bank was appointed administrator with the will annexed of his estate. His widow, also made a party, after filing her answer was adjudged mentally incompetent on October 6, 1926, and Henry Workman was appointed her guardian. The infant heirs were also made parties and appeared by their guardian. After a hearing, in which proofs were taken in open court, the trial court filed an opinion denying the relief prayed for, and entered a decree dismissing the bill, from which plaintiff appeals.

The death of Mr. Clink, the mental incompetency of Mrs. Clink, and the statute (3 Comp. Laws 1915, § 12553) prohibiting Mr. and Mrs. Bolt from testifying to facts equally within the knowledge of Mr. Clink, deprive us of testimony which would doubtless be conclusive on the questions presented. We can, however, but consider the proofs submitted, and draw such inferences as are fairly justified therefrom. There is little, if any, dispute in the testimony.

It seems to be conceded that, while the property was conveyed to Clink as trustee, a title in fee thereby vested in him. We think it may fairly be inferred that the contract made by him with Bolt was in fulfillment of an obligation resting upon him to permit Bolt to secure to himself a part of the equity he had in such property at the time the conveyance was made. This inference, if fairly drawn, as we think it is, aids much in arriving at a correct

understanding of the transactions afterwards occurring.

When the mortgage was foreclosed and the properties sold for the full amount due the creditors of the lumber company, Clink stood to lose nothing. The obligation he had assumed was then satisfied. But, if the property was worth much more than the price for which it was then sold, Bolt would be the loser. That Clink consulted him about the deal with Meeske cannot be doubted. He took no part in the transfer then made for the reason that he had no apparent interest in the property. Mr. Meeske testified:

"*Q.* Now what arrangement did Mr. Clink make with you about redeeming those lands?

"*A.* He made the arrangement that he, that I should redeem this land and he would give me six per cent. for my money that I paid out, and I would get my money back, and I would have half of the profit and the other half of the profit he will take, and he mentioned at the time that the profit was not alone for him, but Mr. Bolt should have half of it.
*   *   *

"*Q.* But I say, was that the only time that you have recollection of Mr. Clink mentioning Mr. Bolt's interest in the matter?

"*A.* I could not say that. I think he mentioned it several times, but I could not say, you know, what time it was he mentioned it, but he mentioned it."

Fritz L. Meeske, to whom some of the property was conveyed by Clink on his settlement with Otto, his father, testified:

"*Q.* Now, before you obtained this deed had you some conversation with Mr. Clink in regard to his consulting the Bolts with reference to this sale?

"*A.* Yes, sir.

"*Q.* Will you state what it was?

"*A.* He said that in order to get me a deed of this property— In the first place I wanted to have the accounting brought right up to date. In other words, I had advanced a great deal of money for taxes over a period of years which had never been paid back for, and I said that it was time that a settlement was made. I was very anxious to have that done myself, so I had a bookkeeper make up a statement of the account to date and presented it to him. He said at that time that it was— He accepted that as being satisfactory, and said that before going any further in the matter he had to make his peace with the Bolts. That is about all that was said."

Tom J. G. Bolt, an uncle of plaintiff, testified:

"Clink said to me 'I have saved, or made, a lot of money for us on this DuBois property (or on his contract or agreement) and Orin and I have been just like one and working together and made or saved a lot of money.' I have forgotten which, and we talked further and he told me, and, of course, he knew I knew all about the property, and talked about this very property and what Orin and he were doing, and that he was going to make a rich man out of Orin and that he was going to have a lot of money when he was through with it. * * *

"I can't place the time exactly, but numerous times we have talked about it. More than once he told me about the amount of money, but not the exact amount, that he was going to make for him and Orin, and that he and Orin were going to be wealthy out of the DuBois property."

Virginia O'Toole, a stenographer in Mr. Clink's office, testified that on several occasions she called plaintiff's wife to the office to talk over deals then pending, that Clink and Mrs. Bolt visited some of the property in company with a prospective purchaser, and that she drew a check, which Clink

signed, payable to Mrs. Bolt, for $1,700, and it was delivered to and cashed by her.

Tom Bolt testified:

"Clink asked me if Mrs. Bolt told me about the money that he had paid Orin or advanced on that contract or agreement of his with Orin."

All of this testimony was competent and material, and, in our opinion, it establishes the claim of plaintiff that when the Meeske deed was made it was agreed that plaintiff should benefit to the same extent as Clink in any profit resulting therefrom.

The defendants, while insisting that no such agreement was made, also contend that it should not be enforced for several reasons:

1. It is claimed that plaintiff did not fully perform. It is true that the evidence does not show that he was the procuring cause of many of the sales made, but it does appear that he placed these lands in the hands of Silas A. Gritzner, a real estate agent, and that through him what is spoken of as the "Bay Mill property" was afterwards sold for $20,000. This agent also testified that he "tried to sell more, but Mr. Clink didn't seem to want to sell any more." That Clink was satisfied with the efforts plaintiff made appears clearly from the testimony heretofore quoted.

2. It is said that the contract of March 16, 1909, was abandoned or rescinded by plaintiff. We find no evidence to support this claim. His consent to the contract made by Clink with Meeske was but a modification of it, rendered necessary by the condition then existing. Nor do we think he was thereby equitably estopped from asserting the claim now made by him.

3. It is claimed that his laches in beginning suit has been so great as should bar relief in a court of

equity. The agreement between Clink and Meeske provided that Clink should receive nothing until Meeske was repaid for all sums advanced by him to redeem from the foreclosure sale. Under plaintiff's contract with Clink he was not entitled to any share of the profits until such indebtedness was satisfied. While Clink did receive certain of the profits from Meeske as early as 1914, a final settlement between them was not reached until 1923. On March 5, 1923, Clink gave Mrs. Bolt the check for $1,700 above referred to. No statement accompanied it, nor is she permitted to testify as to what Clink said to her at the time it was delivered. While plaintiff, had he been informed of the particulars of the dealings between Meeske and Clink, might perhaps have been justified in bringing this suit before that time, he had the right to await a full settlement between them before doing so. It also appears that Clink joined with Meeske in conveying some of the land as late as July 11, 1924. Mr. Clink died on April 13, 1925. The bill of complaint was filed on May 17, 1926.

Defendants' counsel, pursuant to notice from plaintiff's attorneys, produced two letters written by plaintiff to Mr. Clink in 1916, asking for a statement of the account between them and a payment thereon. The deal with Meeske was referred to. While these letters were not admissible as tending to establish plaintiff's claim (*Leonard* v. *Piggott*, 152 Mich. 436), they were competent evidence to show that plaintiff was then making claim that Clink was indebted to him on account of his dealings with Meeske, and tend to refute defendants' claim that the present suit is an afterthought on his part, conceived after Clink's death and when refutation by him was impossible. *Illinois Roofing Co.* v. *Advertising Co.*, 142 Mich. 698.

"Delay to assert a right does not in itself constitute laches." *Sanders* v. *Campbell,* 231 Mich. 592, 595.

In *Oliver* v. *Piatt,* 3 How. (U. S.) 333, 411, it was said:

"The mere lapse of time constitutes of itself no bar to the enforcement of a subsisting trust; and time begins to run against a trust only from the time when it is openly disavowed by the trustee, who insists upon an adverse right and interest, which is fully and unequivocally made known to the *cestui que trust.*"

The rule thus stated has been many times followed by this court. *Frank* v. *Morley's Estate,* 106 Mich. 635; *Roemelmeyer* v. *Roemelmeyer's Estate,* 219 Mich. 322, and cases cited.

A trust relation here existed, and in our opinion the delay in commencing suit to enforce it, when there is no evidence of any denial of liability under it, should not be held to be a bar thereto.

The decree is reversed and set aside and one entered here granting plaintiff the relief prayed for in his bill, with costs of both courts. If counsel cannot agree upon the accounting to be had, the record will be remanded to the trial court for that purpose.

NORTH, C. J., and FEAD, FELLOWS, WIEST, CLARK, McDONALD, and POTTER, JJ., concurred.